UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT OWENSBORO

CIVIL ACTION NO. 4:21-CV-119                    ELECTRONICALLY FILED

BLAINE BRAY                                                    PLAINTIFF

v.                    **MEMORANDUM IN SUPPORT OF**
                     **MOTION FOR SUMMARY JUDGMENT**

KEVIN MAZZA et al.                                         DEFENDANT

      Come now the Defendants, by counsel, and submit the following Memorandum in Support of Summary Judgment.

## INTRODUCTION

      In an effort to keep contraband from reaching inmates via mail, some state correctional facilities instituted a new privileged mail[1] protocol which involves opening and making photocopies of privileged mail; the photocopies are then provided to inmates. Officials at these facilities implemented the protocol in accordance with the Department of Corrections Policies and Procedures Section 16.2, which relates to inmate mail. Detecting drug contraband entering correctional facilities via the mail is challenging because drugs can be sprayed onto paper, incorporated into ink, hidden under stamps, and inconspicuously concealed within a piece of correspondence. The ever-changing methods used to hide the drugs, along with the sheer volume of mail received daily and the lack of reliable field tests, make it difficult to detect all drugs through physical screening. Undetected drugs that are delivered to inmates pose significant health and safety concerns, including overdose and death.

      Green River Correctional Complex ("GRCC") developed a protocol for handling privileged mail in which, when privileged mail is received, the inmate is called to the mail room.

---

[1] "Privileged mail" (a.k.a. "legal mail") is mail from attorneys, courts and government officials.

Upon arrival the privileged mail is opened in front of the inmate, visually inspected for contraband, and then photocopied in the inmate's presence. (DN 1-1, PageID#: 19-20). The copies are then given to the inmate and the inmate is given an opportunity to review the pages to ensure the copies are accurate. (Id.). The inmate can then choose to either have the original pages shredded in their presence, sealed in their presence and returned to the sender, or sealed in their presence and mailed to an individual outside the prison. (Id.)

Plaintiff, an inmate, filed this action pursuant to 42 U.S.C. § 1983 regarding the way privileged mail is handled and processed at GRCC. Following initial screening pursuant to 28 U.S.C. § 1915A and *McGore v. Wrigglesworth*, 114 F.3d 601 (6th Cir. 1997), the Court allowed the following claims to proceed:

- First and Fourteenth Amendment claims against Defendant McRoy for allegedly withholding court documents with case numbers added and reading it outside his presence

- Claim for injunctive relief against all Defendants in their official-capacity for copying incoming legal mail and discarding the originals and "disregarding of first class postage return envelopes."

- Claims under KRS §§ 13A.130, 196.035, 197.020 and CPP 16.2 against all Defendants.

## SUMMARY JUDGMENT STANDARD

Federal Rule of Procedure 56(a) establishes that summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." There is no genuine issue of material fact when "looking to the record as a whole, a reasonable mind could come to only one conclusion. . . ." *Mickler v. Nimishillen & Tuscarawas Ry. Co.*, 13 F.3d 184, 186 (6th Cir. 1993) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)). The moving party bears the initial burden of "informing the District Court of the basis of its motion" and identifying the matter it believes demonstrate[s] the

absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, (1986). The moving party is not required to support its motion with evidence, but need only demonstrate the absence of evidence to support the nonmoving party's claim. *Turner v. City of Taylor*, 412 F.3d 629, 638 (6th Cir. 2005)(citing *Celotex Corp.*, 477 U.S. at 325).

Once the party moving for summary judgment meets its burden, the non-moving party must present evidence of "specific facts showing that there is a genuine issue for a trial." *Celotex Corp.* at 324. The non-moving party has to "do more than simply show that there is some metaphysical doubt as to the material facts.*" Matsushita v. Zenith Ratio Corp.*, 475 U.S. 574, 586 (1986). It is not sufficient for the non-moving party to rest on its pleadings. Rather, the non-moving party must present facts proving that a genuine factual issue exists by "citing to particular parts of the materials in the record" or by "showing that the materials cited do not establish the absence…of a genuine dispute…" Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

## ARGUMENT

### I. The Plaintiff failed to exhaust his administrative remedies.

42 U.S.C. § 1997e – the Prison Litigation Reform Act ("PLRA") – provides that no action shall be brought with respect to prison conditions under 42 U.S.C. § 1983 or any other Federal law, "by a prisoner confined in any jail, prison, or other correctional facility" until the prisoner has exhausted the administrative remedies made available to him. 42 U.S.C. § 1997e(a); *Porter v. Nussle*, 534 U.S. 516 (2002); *Knuckles El v. Toombs*, 215 F.3d 640 (6th Cir.), cert. denied, 531 U.S. 1040 (2000). The exhaustion requirement applies even when the applicable administrative processes do not make money damages available. *Id*.; *Wyatt v. Leonard*, 193 F.3d 876 (6th Cir. 1999). The PLRA's exhaustion requirement also applies to all inmate suits about prison life,

"whether they involve general circumstances or particular episodes, and whether they alleged excessive force or some other wrong." *Porter*, 534 U.S. at 532; *Knuckles El*, 215 F.3d at 643; and *Freeman v. Francis*, 196 F.3d 641, 642-44 (6th Cir. 1999).

As stated in *McCloy v. Correction Medical Services*, "[t]his exhaustion requirement is mandatory and applies to all suits regarding prison conditions, regardless of the nature of the wrong or the type of relief sought." 794 F.Supp.2d 743, 749 (E.D.Mich. 2011) (citing *Porter*, 534 U.S. at 524; *Booth v. Churner*, 532 U.S. 731, 741 (2001)). Moreover, according to *Woodford v. Ngo*, "exhaustion" under the PLRA means "compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." 548 U.S. 81, 90-91 (2006). Further, "[t]he level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones v. Bock*, 549 U.S. 199, 218, (2007).

In the case at hand, the Kentucky Department of Corrections had in effect an inmate grievance procedure available to the Plaintiff. Plaintiff failed to exhaust the administrative remedies available to him by failing to submit a grievance form addressing all of the issues of which he now complains.

Corrections Policy & Procedure ("CPP") 14.6, "INMATE GRIEVANCE PROCEDURE," requires an inmate to submit a grievance about an incident such as the one that is the subject of this action, "within five (5) working days after the incident occurs." (CPP 14.6(II)(J)(1)(a)(2), pg. 8).[2]

---

[2] https://corrections.ky.gov/About/cpp/Documents/14/CPP%2014.6%20-%20Grievance%20-%20Effective%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.pdf

The Plaintiff attached a copy of his grievance to his Complaint. (DN 1-1, PageID#: 18) The only issue raised in that grievance is that legal mail is being illegally copied and discarded. *Id*. The Plaintiff did not allege in his grievance that Defendant McRoy was reading his legal mail and withholding court documents with case numbers added on the mail. Plaintiff also did not allege in his grievance that the defendants were discarding return envelopes. The law mandates that an inmate must give fair notice to prison officials of the "alleged mistreatment or misconduct that forms the basis of the constitutional or statutory claim made against a defendant in a prisoner's complaint." *Burton v. Jones*, 321 F.3d 569, 574-75 (6th Cir. 2003). The Plaintiff's grievance fails to give prison officials fair notice of his claim that Defendant McRoy was withholding court documents and reading legal mail outside the inmate's presence and his claim that return envelopes were being discarded.

Plaintiff failed to "compl[y] with an agency's deadlines and other critical procedural rules" required to exhaust the claims he now asserts. *Woodford*, 548 U.S. at 90-91. As required by the PLRA and Supreme Court in *Woodford*, the Defendants are entitled to dismissal of the Plaintiff's claims.

## II.     The Plaintiff is not entitled to injunctive relief.

In general, the standard for granting a permanent injunction is "essentially the same" as that for a preliminary injunction, except that a plaintiff must demonstrate actual success on the merits rather than likelihood of success. *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n.12, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987). A plaintiff seeking a permanent injunction must demonstrate that he or she has suffered irreparable injury, there is no adequate remedy at law, "that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted," and that it is in the public's interest to issue the injunction. *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).

**a. GRCC's privileged mail protocol does not violate the First Amendment.**

The Plaintiff is not entitled to success on the merits of his claim because GRCC's privileged mail protocol does not violate the First Amendment. "As to the ability to open the mail in the presence of inmates, this could in no way constitute censorship, since the mail would not be read. Neither could it chill such communications, since the inmate's presence ensures that prison officials will not read the mail." *Wolff v. McDonnell*, 418 U.S. 539 (1974). The Supreme Court has not retreated from that stance over the past four decades. In this case, the protocol does not permit facility employees to open mail outside the inmate's presence, read the contents of privileged mail or retain copies of privileged mail. Rather, GRCC's privileged mail protocol still enforces those rules by mandating:

    i.    General population inmates with incoming privileged mail will be called up to the Mailroom. Upon arrival <u>and prior to the incoming privileged mail being opened</u>, the inmate must sign acknowledging receipt of copies of materials contained within the unopened envelope and indicate a method of disposition for the original documents and/or materials within.

    ii.    Upon opening of the incoming parcel, Mailroom staff will, <u>without reading the material</u>, determined the appropriate method for copying the materials…

    iii.    Mailroom staff will proceed with the disposition of the original documents in the manner specified by, <u>and in the presence of that inmate</u>."

    iv.    This facility <u>will not</u> (original emphasis) maintain the original documents of an inmate's privileged mail, except when such item is believed to contain or has the possibility of containing items or substances considered to be dangerous contraband.

(DN 1-1, PageID#: 19-20)

Plaintiff argues that the original privileged mail document must be delivered to the recipient. However he has pointed to no case, statute or regulation that requires as much. Nor is counsel for the Defendants aware of any such law. Here, inmates can still receive the same volume and type of privileged mail as they always have. Prison officials continue to open and inspect privileged mail in the presence of the recipient inmates, then provide them with copies of the documents. The original documents are then destroyed. "[T]he inmate's presence ensures that

attorney mail will not be read and prison officials are assured that the mail contains no contraband." *Al-Amin v. Smith*, 511 F.3d 1317 (11th Cir. 2008) Therefore, GRCC's privileged mail protocol does not infringe upon inmates' First Amendment rights or interfere with the confidentiality between them and their attorneys. The privileged mail protocol preserves the protected status for privileged mail while substituting the paper on which the communication is to be delivered to the inmate. This change does not have any impact on First Amendment rights as all of the protections dictated by the Supreme Court in *Wolff v. McDonnell*, 418 U.S. 539 (1974) regarding inmate legal mail are still in force.

I. **Even if the Court believes the privileged mail protocol violates the First Amendment, there is a rational connection between the privileged mail protocol and GRCC's interest in the safety and security of the staff and inmates.**

"As maintaining security, order, and discipline are essential goals of a corrections system, prison officials are accorded wide latitude in the adoption and application of prison policies and procedures." *Bell v. Wolfish*, 441 U.S. 520, 546-47 (1984). The Supreme Court has held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78 (1987). This principle has continued to be accepted in numerous courts. "A prisoner's right to receive mail is protected by the First Amendment, but prison officials may impose restrictions that are reasonably related to security or other legitimate penological objectives." *Sallier v. Brooks*, 343 F.3d 868 (6th Cir. 2003). The Tenth Circuit has also held that mail restrictions on inmates are reasonably related to a legitimate penological interest in the absence of any allegation that the restrictions imposed any atypical or significant hardship on a prisoner. *Hale v. Federal Bureau of Prisons*, 759 Fed. Supp. Appx. 741 (10th Cir. 2019).

The Court in *Turner* set forth four factors to establish this relationship: (1) whether there is a "valid, rational connection" between the regulation and the prison's interest; (2) whether there

are "alternative means of exercising the right that remain open to prison inmates;" (3) the impact accommodation would have on guards, inmates, and prison resources; and (4) whether alternatives to the prison regulation are readily available." *Turner*, 482 U.S. at 89-91. The *Turner* test does not "subject the judgment of prison officials to an inflexible strict scrutiny analysis," nor does it involve inquiry into the "least restrictive means" to accomplish those interests. *Id*.

The *Turner* test is to be applied with great deference to prison authorities. "[U]nder *Turner* and its predecessors, prison officials are to remain the primary arbiters of the problems that arise in prison management." *Shaw v. Murphy*, 532 U.S. 223, 230 (2001). See also *Procunier v. Martinez*, 416 U.S. 396, 405 (1974) ("[C]ourts are ill equipped to deal with the increasingly urgent problems of prison administration and reform"). "[I]n the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these [safety] considerations, courts should ordinarily defer to their expert judgment in such matters." *Turner*, 482 U.S.,at 86 (quoting *Pell v. Procunier*, 417 U.S. 817, 827 (1974)).

Rational Connection

Under *Turner*, the court must first determine "whether there is a valid, rational connection between the prison regulation and the legitimate interest put forth to justify it." *Turner*, 482 U.S. at 89-91. Courts "must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003). It is the Plaintiff's burden to disprove the validity of a prison regulation. *Id*.

Detecting contraband "is a most serious responsibility" of prison officials. *Florence v. Board of Chosen Freeholders of County of Burlington*, 566 U.S. 318, 332 (2012). See also *Wolff*, 418 U.S. at 577 (Constitution allows prisons to open attorney mail addressed to inmate in presence

of inmate in order to inspect for contraband).  There is a valid, rational connection between prohibiting inmates from accessing original mail and stopping unlawful drugs from entering the prison.  Contraband presents a danger to any prison and it can be provided through the mail.

According to an analysis of data from the Bureau of Justice Statistics, between 2001 and 2018, the number of people who died of drug or alcohol intoxication in state prisons increased by more than 600%.[3]

"Detecting drug contraband entering correctional facilities via the mail is challenging because drugs can be sprayed onto paper, incorporated into ink, hidden under stamps, and inconspicuously concealed within a piece of correspondence. The methods used to hide the drugs, coupled with the sheer volume of mail received daily, make it difficult to detect all drugs through physical screening." In addition, there is no type of drug testing available that can reliably detect the presence of drugs sprayed onto paper.  Undetected drugs that are delivered to inmates pose significant health and safety concerns, including overdose and death."[4]

Contraband drugs can undermine the safety and security of a correctional facility in a variety of ways. For example, the drug trade is a lucrative criminal enterprise, and inmate gangs often use violence to protect their interests.  The availability of drugs undermines a facility's rehabilitative efforts in support of inmates who desire to overcome addiction. Inmates under the influence of drugs may become violent toward staff or other inmates. Further, evidence suggests that some newer forms of contraband drugs (e.g., synthetic cannabinoids, fentanyl, and fentanyl

---

[3] Beth Schwartzapfel and Jimmy Jenkins, *Inside The Nation's Overdose Crisis in Prisons and Jails*, The Marshall Project (November 1, 2021, 3:58 p.m.), https://www.themarshallproject.org/2021/07/15/inside-the-nation-s-overdose-crisis-in-prisons-and-jails

[4] J. Russo, M. Planty, J. Shaffer, M.N. Parsons, J.D. Roper-Miller, *Mitigating Contraband via the Mail: An Overview of Approaches for Managing the Introduction of Drug Contraband through the Digitization of Inmate Mail,* Office of Justice Program's National Criminal Justice Reference Service, pg. 2, https://www.ojp.gov/pdffiles1/nij/grants/302140.pdf

compounds) are becoming more prevalent and more dangerous; correspondingly instances of inmate overdoses and deaths are on the rise.[5]

Kentucky, as well as several states, have seen drugs entering prisons soaked into the mail sent to inmates under the guise of privileged mail.[6] [7] [8] [9] The new privileged mail protocol addresses this concern by eliminating the original document. If the new protocol is revoked, it will likely result in further adverse health effects on prison personnel, as well as the inmate population. Therefore, there is a valid, rational connection between prohibiting inmates from accessing original mail and stopping unlawful drugs from entering the prison.

<u>Alternative Means</u>

Under the new privileged mail protocol inmates are provided with a copy of the original mailing and the content is not censored or otherwise prohibited. Therefore, inmates do not need an alternative means to exercise their right to correspond with attorneys. While the Plaintiff may prefer the original copies of all correspondence, under the law "alternatives . . . need not be ideal; they need only be available." *Overton v. Bazzetta*, 539 U.S. 126, 135 (2003). Plaintiff has failed to show that only receiving a photocopy of his correspondence prevents him from meaningfully exercising his right to correspond with attorneys.

---

[5] *Id*. pg. 3.
[6] Nussbaum, K. (2021, September). Paper Letters Soaked in Drugs Leads Jail to Digitize Mail. Retrieved from https://www.govtech.com/news/paper-letters-soaked-in-drugs-leads-jail-to-digitize-mail

[7] Ariza, M. (2019, September). How to get drugs into 50 prisons? Soak inmates' mail in heroin, ecstasy and fentanyl. Retrieved from https://www.sun-sentinel.com/news/crime/fl-ne-fugitive-roy-kahn-kingpin-pimp-smuggled-dope-federal-prison-20190924-xgwxe5fz3rf77ijjn2aqh5kydy-story.html

[8] U.S. Attorney's Office (2021, July). Two SCI Inmates, Two Allegheny County Residents Charged in Schemes to Smuggle Synthetic Cannabinoids into State Prisons and to Obtain Pandemic Unemployment Benefits. Retrieved from https://www.oig.dol.gov/public/Press%20Releases/Two_SCI_Inmates_Two_Allegheny_County_Residents_Charged_in_Schemes_to_Smuggle_Synthetic_Cannabin.pdf

[9] Exhibit A (attached) is a summary of just some of the instances where Kentucky DOC employees have discovered contraband drugs hidden inside privileged mail over the past 3 years.

Impact on prison guards and other inmates

If the right in question "can be exercised only at the cost of significantly less liberty and safety for everyone else, guards and other prisoners alike … the courts should defer to the informed discretion of corrections officials." *Thornburgh v. Abbott*, 490 U.S. 401, 418 (1989) (internal quotations and citations omitted).

As discussed above, allowing drugs to be introduced into the prison through privileged mail has a significant impact on inmates, officers, and the general public.[10]  Therefore, the circumstances warranted an immediate and decisive response to the problem.  It is reasonable to infer that the practice of sending drugs through privileged mail would continue if the privileged mail protocol were to be declared unconstitutional, putting prison staff and inmates at risk once again.

Existence of alternatives

Finally, there are no ready alternatives that accommodate Plaintiff's rights at a *de minimis* cost to DOC.  The new privileged mail protocol is currently the most effective and fool-proof means to deal with this new and dangerous health and safety problem facing the state prison system.[11]  Because the drug-soaked paper is hard to detect, the continued delivery of original mail to the inmate population is problematic.

"The existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns.  This is not a 'least restrictive alternative' test: prison officials do not have to set up and then shoot down every conceivable

---

[10] (2018, August).  Troopers: 29 people at Ohio prison were exposed to fentanyl-heroin mix.  Retrieved from https://www.wlwt.com/article/doctors-fentanyl-likely-sickened-29-at-ohio-prison/22861838.  See also notes 2-4, supra.

[11] The Department of Corrections is currently in the process of developing a new system for the handling of privileged mail which will allow them to verify that incoming privileged mail was sent from a legitimate attorney, court or government official.  There is no such system currently on the market, therefore the Department of Corrections has to develop and build the system from scratch, which is not a fast process.  If the system being developed proves to be effective the Department will be able to cease coping incoming privileged mail.

alternative method of accommodating the claimant's constitutional complaint." *Turner*, 482 U.S. at 90–91(internal citation omitted)

At least one court has found that copying incoming mail <u>is the easy alternative</u> to prevent the introduction of contraband through the mail. In *Sweeney v. Commissioner, Indiana Department of Correction*, in order to impede the introduction of narcotics and synthetic narcotics into the Department's facilities the Commissioner issued an Executive Directive stating, "greeting cards, colored envelopes, colored paper, newspaper clippings, and any personal correspondence printed/written on any paper other than originally purchased plain white, lined paper shall no longer be considered allowable correspondence." 2018 WL 4566710, at *1 (S.D. Ind. Sept. 24, 2018). When the regulation was challenged, the court conducted an analysis under *Turner*. In evaluating whether there were ready alternatives to the regulation the Court declared "Here, an obvious easy alternative exists—prison staff can copy all incoming correspondence—and has been successfully implemented by at least two prisons." *Id*. at *3.

### b. The Plaintiff has not suffered an irreparable injury.

As discussed *supra* , GRCC's privileged mail protocol does not infringe upon inmates' First Amendment rights or interfere with the confidentiality between them and their attorneys. Inmates can still receive the same volume and type of privileged mail as they always have. Prison officials continue to open and inspect privileged mail in the presence of the recipient inmates, then provide them with copies of the documents. The original documents are then destroyed. "[T]he inmate's presence ensures that attorney mail will not be read and prison officials are assured that the mail contains no contraband." *Al-Amin v. Smith*, supra. The privileged mail protocol preserves the protected status for privileged mail while substituting the paper on which the communication is to be delivered to the inmate. Providing the Plaintiff with a copy of his legal mail in lieu of the

original will not cause the Plaintiff to suffer an irreparable injury. He continues to enjoy uninterrupted confidential communication with his attorneys.

### c. The equities weigh against granting the Plaintiff's request for an injunction and granting an injunction would not serve the public's interest.

When analyzing a request for an injunction, the court is also required to examine equitable considerations, particularly whether the respondents or the public interest would be harmed by issuing the injunction. In the case at bar, those factors weighs against granting the Petitioner's motion.

Deference is due in the context of the operation and administration of a prison. Operating a prison "is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources." *Turner v. Safley*, 482 U.S. 78, 85 (1987). The problems that arise in jails and prisons are "complex and intractable." *Id*. at 84. Courts are "ill equipped" to deal with these "increasingly urgent problems," as they are "not readily susceptible of resolution by decree." *Id*. (citation omitted). Therefore, courts must adhere to a "policy of judicial restraint." *Id*. They must accord "wide-ranging deference" to jail and prison administrators "in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979).

If an injunction is granted in the instant action, it would seriously impair the ability of prison officials to detect and prevent the smuggling of contraband into prison facilities. This would cause a dramatic impact on the prison staff, inmates, and prison resources. There would be a great risk of contraband being introduced into state correctional facilities. This would endanger both correctional staff and inmates.

Reports of staff falling ill following incidents in which they have accidentally inhaled second-hand smoke from inmate's use of synthetic cannabinoids or encountered fentanyl while

conducting a search have been noted in several U.S. correctional facilities.[12] [13] [14]  Concerns regarding life-threatening risks associated with passive or incidental exposure have been documented by the Centers for Disease Control and Prevention.[15]  Regardless of the likelihood of serious harm, staff are personally affected, and incidents can have critical consequences for the facility in the form of lockdowns, hazardous material cleanups, and reduced staff availability due to illness.

Inmates are also at risk if contraband continues to be introduced into the prisons.  Individual inmates have experienced severe reactions to illicit substances which required medical intervention and/or have engaged in violent actions against staff while under the influence of such substances.  Further, the presence of illegal drugs and other contraband would increase gang activity and violence as they vied for control of the supply and distribution of these items.

Because the use of illicit substances creates an increased risk for severe medical incidents to individual inmates, and an increased risk of danger to staff and other inmates who may come in contact with an inmate under the influence of such substances, any inmate's use of illicit substances within a prison places all inmates, staff, and the general public at risk.  Therefore, the impact of an injunction preventing the copying of inmate mail would be very detrimental to Defendants.

---

[12] Kalinowski, B. (2021, March). Two SCI-Dallas officers sickened by drug-laced mail. Retrieved from https://www.citizensvoice.com/news/doc-two-sci-dallas-officers-sickened-by-drug-laced-mail/article_4acf895a-81e5-52fb-b927-540fb12089eb.html

[13] Esack, S. (2018, August). Pennsylvania orders lockdown of all state prisons, cites sickness from smuggled chemical drugs.  Retrieved from  https://www.mcall.com/news/breaking/mc-nws-pennsylvania-state-prisons-lockdown-20180829-story.html

[14] Duggan, P. (2018, August), Fentanyl exposure sickened Ohio prison staff.  Retrieved from https://www.washingtonpost.com/local/public-safety/fentanyl-exposure-sickened-ohio-prison-staff/2018/08/30/23fcbbec-ac82-11e8-b1da-ff7faa680710_story.html

[15] Centers for Disease Control and Prevention. (2020). Preventing emergency responders' exposures to illicit drugs. Retrieved from https://www.cdc.gov/niosh/topics/fentanyl/risk.html

Copying incoming mail is not the only step being undertaken by the Department of Corrections to combat the introduction of contraband. The most common ways for contraband to be introduced into a prison are (a) through the mail, (b) being thrown over the fence, (c) through visitation, or (d) through staff. The Department of Corrections has implemented or is in the process of implementing procedures that it expects will significantly restrict (and hopefully eliminate) contraband being thrown over the fence or introduced through non-privileged mail or during visitation or by staff.[16] Therefore the only avenue remaining for the introduction of contraband is through privileged mail. If an injunction is granted, individuals will continue to come up with new and inventive methods to introduce contraband through privileged mail. Therefore, the Defendants will be in a constant losing battle in the war on prison contraband. The loser will be the prison staff and inmates who continue to be exposed to dangerous drugs and the violence that accompanies the illicit drug trade inside a prison.

### III. The Defendants have not violated state law.

Plaintiff argues that GRCC's new privileged mail protocol, which requires that all privileged mail be photocopied and the photocopy given to the inmate while the original is destroyed, is a violation of and deviation from the procedure mandated in CPP 16.2. While the new privileged mail protocol is a deviation from the *traditional method* of handling privileged mail that inmates have enjoyed over the years, **it is not a deviation from CPP 16.2**.

The relevant portions of CPP 16.2 state:

C. Privileged Mail

1.  Incoming privileged mail shall be opened in the presence of the inmate and inspected for contraband.

2.  … Incoming privileged mail shall not be read if the sender is adequately identified on the envelope and the purpose of the mail is not an issue in

---

[16] Those procedures include the use of drones and body scanners among other methods.

determining whether it should be considered privileged mail. In the absence of adequate identification or a question about the purpose, staff may open and inspect the mail to ascertain whether it is, in fact, privileged mail.

…

6. Incoming privileged mail shall be recorded as to the date and time of delivery to the inmate. The inmate may be required to sign for receiving privileged mail.

CPP 16.2(II)(C)[17]. The new privileged mail protocol does not change any of those rules. Under the new protocol all incoming privileged mail still has to be opened in the presence of the inmate, staff are still prohibited from reading the mail, and the date and time of delivery are still recorded. (DN 1-1, PageID#: 19-20) The only difference is that now staff photocopy the mail and provide the copy to the inmate. While the current version of CPP 16.2 does not require DOC to copy incoming privileged mail, it also does not prohibit DOC from copying incoming privileged mail.[18] Therefore, DOC's decision to copy all incoming privileged mail is not a violation of CPP 16.2. See *Deal v. First and Farmers National Bank, Inc.,* 518 S.W.3d 159, 170 (Ky. App. 2017)(" While the federal regulations do not require notice to be given to either the court or the judgment creditor, nothing suggests that they prohibit it either….Not requiring the notice to be provided is a far different matter than prohibiting it.")

An agency's interpretation of its own regulations is entitled to substantial deference. *Camera Center, Inc. v. Revenue Cabinet*, 34 S.W.3d 39 (Ky. 2000). A reviewing court is not free to substitute its judgment as to the proper interpretation of the agency's regulations as long as that interpretation is compatible and consistent with the statute under which it was promulgated and is not otherwise defective as arbitrary or capricious. *City of Louisville by Kuster v. Milligan*, 798

---

[17] https://corrections.ky.gov/About/cpp/Documents/16/CPP%2016.2%20-%208-11-21.pdf

[18] Notably, other jurisdictions have policies that specifically prohibit them from copying mail from attorneys. For example, the Federal Bureau of Prisons' policy states "(a) The Warden shall open incoming special mail only in the presence of the inmate for inspection for physical contraband and the qualification of any enclosures as special mail. **The correspondence may not be read or copied** if the sender is adequately identified on the envelope, and the front of the envelope is marked "Special Mail - Open only in the presence of the inmate". 28 CFR § 540.18 (emphasis added)

S.W.2d 454, 458 (Ky. 1990).    The Defendants' interpretation that its policy on inmate correspondence does not prohibit incoming privileged mail from being photocopied and the copy given to the inmate is not arbitrary or capricious.[19]    Therefore this Court must give substantial deference to the Defendants' interpretation.

### i. GRCC's privileged mail protocol does not have to be promulgated as an administrative regulation.

Even if this Court believes that GRCC's new privileged mail protocol is a modification of CPP 16.2, under Kentucky's Administrative Procedures Act that protocol is not required to go through the administrative regulation process.  KRS 13A.100 states:

> Subject to limitations in applicable statutes, any administrative body that is empowered to promulgate administrative regulations shall, by administrative regulation, prescribe, consistent with applicable statutes:
>
> > (1) Each statement of general applicability, policy, procedure, memorandum, or other form of action that implements; interprets; prescribes law or policy; describes the organization, procedure, or practice requirements of any administrative body; or affects private rights or procedures available to the public

However not all prison directives are subject to the rule-making provisions of Chapter 13A. KRS 13A.010(2)(a) excludes "[s]tatements concerning only the internal management of an administrative body and not affecting private rights or procedures available to the public" from the promulgation requirements of Chapter 13A.

The procedures for handling incoming privileged mail are matters of the internal management of the Department of Corrections.  These internal management procedures serve as an instruction manual, dictating what happens when mail is received before it is delivered to the inmate.  The privileged mail protocol does not address topics such as who can send privileged mail, how much mail inmates can receive, or the procedure to identify mail as privileged mail.

---

[19] Black's Law Dictionary defines "arbitrary and capricious" as "[a] willful and unreasonable action without consideration or in disregard of facts or law."

Therefore, it does not establish rights that inmates or other members of the public are entitled to or procedures for them to follow.

Internal Management

In *Bowling v. Kentucky Dept. of Corrections*, 301 S.W.3d 478 (Ky. 2009) the Supreme Court quoted approvingly from *Evans v. State*, 914 A.2d 25 (2006) where the Maryland Supreme Court ruled that:

> The real test of whether a DOC Directive (or other policy statement) is exempt from the APA requirements because it concerns only the internal management of the agency and does not affect public rights is whether, given the nature and impact of the Directive, the Legislature intended that the agency be free to adopt, change, or abrogate the Directive at will, without any public input or legislative review.

*301 S.W.3d* at 489.

> As the U.S. Supreme Court noted in *Bell v. Wolfish*:

> The problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions. Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. Such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters."

441 U.S. 520, 546–48 (1979). Only experienced DOC personnel know what security measures are needed to prevent the flow of drugs entering the prison. The procedures required to detect contraband are constantly changing as individuals discover new types of drugs and new methods to smuggle them into prison. Therefore, it is likely that the Legislature intended for DOC to be free to adopt, change, or abrogate their mail protocol at will in order to respond to security threats; making DOC's privileged mail protocol an internal management matter that does not have to be promulgated under KRS Chapter 13A. The Kentucky Supreme Court acknowledged as much when it said that even in cases where the Administrative Procedures Act requires a policy to be

promulgated, "there may well be … security-related issues [that] can be classified properly as purely issues of internal management." *Bowling* 301 S.W.3d at 492.

The internal nature of the privileged mail protocol is further apparent when compared with existing DOC policies established by administrative regulation. 501 KAR 6:020 includes policies such as the inmate grievance system, inmate health services, news media, and victim notification as they are all rights or procedures available to inmates or the public. Admittedly DOC does have a policy on inmate correspondence (CPP 16.2). That policy is a promulgated regulation because it addresses rights or procedures available to inmates and the public. It addresses rights such as: who inmates can send mail to and receive mail from, appeal rights when mail is rejected, and the types of mail that are prohibited. It also dictates specific procedures such as the procedures inmates must follow when sending mail out of the institution. The contents of CPP 16.2 are distinctly different from the privileged mail protocol, which is merely an instruction manual for staff that explains what they should do with legal mail before it is delivered to the inmate.

The internal nature of the privileged mail protocol is also apparent when compared with policies by other agencies which had to be prescribed by regulation. In *Vincent v. Conn*[20], the Court struck down a policy used to deny caretaker benefits because "it plainly affect[ed] private rights" and was not promulgated as an administrative regulation. Similarly, standards of practice used to suspend a surveyor's license and a departmental memorandum used to modify personnel reclassification procedures have been deemed unenforceable.[21] Unlike the privileged mail protocol which establishes procedures for Corrections personnel, these policies all established benefits and procedures available for the public. Because of the privileged mail protocol's internal nature, KRS 13A.100 does not require its promulgation.

---

[20] 593 S.W.2d 99, 101 (Ky.App. 1979).
[21] See *Kerr v. Kentucky State Bd. of Registration for Professional Engineers and Land Surveyors*, 797 S.W.2d 714 (Ky.App. 1990); *Com. Educ. & Humanities Cabinet Dept. of Educ. v. Gobert*, 979 S.W.2d 922 (Ky.App. 1998).

Rights and Procedures

GRCC's privileged mail protocol does not impact the rights of the Plaintiff. It also does not change any of the procedures attorneys must follow in order to send privileged mail to inmates.

Inmates have a constitutional right to receive legal mail, however they do not have a right to original copies of legal/privileged mail. Under GRCC's new privileged mail protocol inmates can still receive legal mail as they always have. The mail is still opened in their presence and staff are not permitted to read the mail. The new privileged mail protocol preserves the protected status for privileged mail, merely substituting the paper on which the communication is delivered to the inmate. This change does not have any impact on inmate rights because all of the protections dictated by the Supreme Court in *Wolff v. McDonnell* regarding inmate legal mail are still in force.

Management of a prison requires flexibility in response to changing circumstances and the inventiveness of inmates. Requiring every security rule change to go through a lengthy rulemaking process would endanger prison security. Other jurisdictions have reached similar conclusions upon examining their state's Administrative Procedures Act. In *L'Heureux v. State Department. of Corrections*, 708 A.2d 549, 553 (R.I. 1998) the court held that the intricate structure of their state's APA provisions "would be ill suited to the management of the often volatile population of the [prison]." The Court of Appeals for the Ninth Circuit declined to apply the Federal APA to prison disciplinary hearings in *Clardy v. Levi*, 545 F.2d 1241 (9th Cir.1976), even though the Bureau of Prisons had not been specifically excluded from the Federal APA. *See also*, *Rose v. Arizona Department of Corrections*, 804 P.2d 845, 849 (App.1991) (holding that inmate disciplinary hearings were not contested cases within the meaning of the Arizona APA); *Langley v. Scurr*, 305 N.W.2d 418, 419 (Iowa 1981) (holding that the APA would be inappropriate for prison disciplinary procedures); *Reed v. Parratt*, 207 Neb. 796, 301 N.W.2d 343, 345 (1981) (holding that the Nebraska APA was not applicable to a prison disciplinary proceeding); *Dawson*

*v. Hearing Committee*, 597 P.2d 1353, 1355 (1979) (holding that the unique nature of prison disciplinary matters would be unsuited to the formal, time-consuming, and adversarial procedures required by the APA). Finally, in *Mandela v. Campbell*, 978 S.W.2d 531, 534 (Tenn. 1998) the Tennessee Supreme Court ruled that "[t]he promulgation requirements of public notice, public hearing, attorney general approval, and filing with the state are simply not realistic requirements for implementing procedures that concern the intricacies and complexities of a prison environment."

In construing statutory provisions, it is presumed that the legislature did not intend an absurd result. *Commonwealth, Cent. State Hosp. v. Gray*, 880 S.W.2d 557, 559 (Ky. 1994). Interpreting KRS Chapter 13A to require DOC to go through the formal, time-consuming, and adversarial procedures required by the administrative regulation process every time a procedure needs to be changed to respond to a new security threat would lead to an unintended and absurd result (i.e., the continued introduction of drugs and other contraband into our prisons).

## IV. The Defendants are entitled to qualified immunity.

### a. The Defendants are entitled to qualified immunity on Plaintiff's § 1981 claims.

The Defendants are entitled to qualified immunity on the Plaintiffs claims for monetary damages under 42 U.S.C. § 1983. As state employees, the Defendants are entitled to qualified immunity if their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Dorsey v. Barber*, 517 F.3d 389 (6th Cir.2008) (citation omitted).

A two-part test is used to determine whether qualified immunity applies: "(1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established." *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310 (6th Cir.2005). For a right to be "clearly established," the "contours of

the right must be sufficiently clear that a reasonable [government official] would understand that what he is doing violates that right." *Harris v. City of Circleville*, 583 F.3d 356, 366–67 (6th Cir.2009). This Court is "free to consider [the two-part test] in whatever order is appropriate in light of the issues before us," and therefore need not decide whether there was a constitutional violation if it determines that an official in the Defendant's position would reasonably believe that his actions were not in contravention of Plaintiff's constitutional rights. See *Jones v. Byrnes*, 585 F.3d 971, 975 (6th Cir.2009) (citation omitted). The plaintiff bears the burden of showing that the right was clearly established. *Cunningham v. Shelby County*, 994 F.3d 761, 765 (6th Cir. 2021). And to do so, a plaintiff must point to a case showing that reasonable officers would have known their actions were unconstitutional under the specific circumstances they encountered. *Id*. at 766.

As discussed *supra*, the Defendants did not violate the Plaintiff's constitutional rights. However, even if it is assumed arguendo that the Plaintiff could raise a genuine issue as to the occurrence of a constitutional violation, the Defendants would be entitled to qualified immunity on the basis that it would not have been sufficiently clear to a reasonable official in the Defendants' position that their actions violated the Plaintiff's constitutional rights. There is no Supreme Court or Sixth Circuit opinion holding that prison officials violate the First Amendment when they provide the inmate a photocopy of incoming privileged mail in lieu of the original in order to stop the flow of illegal drugs into the prison.

The question on the second qualified-immunity prong is not whether Defendants' conduct violated the federal constitution, but whether it was clearly established that such action would violate Plaintiffs rights. In sum, neither the Supreme Court, Sixth Circuit, nor the weight of authority from other courts "squarely" held that a prison official violates the First Amendment by photocopying incoming legal mail in the presence of the inmate and then destroying the original.

### b. The Defendants are entitled to qualified immunity on Plaintiff's state law claims.

#### i. Defendants have absolute official immunity from suit against them in their official capacity.

Official immunity applies to governmental or public officials and shields them from liability for "acts performed in the exercise of their discretionary functions." *Yanero v. Davis*, 65 S.W.3d 510, 521 (Ky. 2001). "Official immunity can be absolute, as when an officer or employee of the state is sued in his/her representative capacity, in which event his/her actions are included under the umbrella of sovereign immunity…" *Id*. At the time of the incidents complained of in the Amended Complaint, the Defendants were all employees of the Commonwealth of Kentucky. Therefore the Defendants are each entitled to absolute official immunity and are not subject to Plaintiff's suit for damages against them in their official capacity.

#### ii. Defendants have qualified official immunity from suit against them in their individual capacity

Qualified official immunity applies to public officials who have been sued in their individual capacity and shields them from liability "for acts performed in the exercise of their discretionary functions." *Id*. To qualify for such immunity, a state officer or employee must be engaged in discretionary acts or functions, must act in good faith, and must be acting within the scope of his or her authority. *Id*. at 522. Discretionary acts or functions are those that involve the "exercise of discretion and judgment, or personal deliberation, decision, and judgment." *Id*. at 522. Qualified immunity does not extend to negligent performance of ministerial acts, which involve the performance of routine duties and do not require the exercise of judgment. *Id*. See also *Collins v. Commonwealth of Kentucky Natural Resources and Environmental Protection Cabinet*, 10 S.W.3d 122, 126 (Ky. 1999). The Plaintiff makes no factual allegations that would show that Defendants are not entitled to immunity in this action.

Plaintiff argues that the Defendants caused him injury when they developed a privileged mail protocol that requires the Plaintiff's incoming privileged mail to be photocopied. The Defendants are entitled to qualified immunity because the decision of how to process incoming mail in order to prevent the introduction of illegal drugs into the prison is a discretionary act that requires the exercise of discretion and judgment.

The Defendants each performed discretionary functions, and the Plaintiff has not presented any facts indicating that the Defendants acted in bad faith or outside the scope of their authority. Therefore, all Defendants are entitled to qualified official immunity and should be immune from the claims filed against them in their individual capacity.

## CONCLUSION

For the reasons stated above, the Defendants respectfully request that summary judgement be granted in their favor.

Respectfully submitted,

*/s/ Allison R. Brown*
ALLISON R. BROWN (#91510)
DEPARTMENT OF CORRECTIONS
Office of Legal Services
275 E. Main Street
P.O. Box 2400
Frankfort, KY 40602-2400
(502) 782-2336
E-Mail: allison.brown@ky.gov
COUNSEL FOR DEFENDANTS

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 8, 2022 I electronically filed this document with the Court by using the CM/ECF system.  I further certify that I mailed this document first class, postage prepaid to the following non-CM/ECF participants:

Blaine Bray #266026
Green River Correctional Complex
1200 River Rd.
P.O. Box 9300
Central City, KY 42330

*/s/ Allison R. Brown*
COUNSEL FOR DEFENDANT